## WALKER v. PATTIN et al.
### No. 2166.

Court of Appeal of Louisiana. First Circuit.
Dec. 12, 1940.

Atlee P. Steckler, of Ville Platte, for appellant.

George L. Fontenot, of Ville Platte, for appellees.

LeBLANC, Judge.

The plaintiff in this suit, John W. Walker, alleges in his petition that during the month of December, 1932, he entered into an agreement with the defendants, L. Alphonse Pattin and H. D. Mack, by the terms of which they would care for his hogs which roamed at large in the woods in the neighborhood of Turkey Creek in Evangeline Parish and that at the end of each year, from the hogs that were slaughtered, there would be an equal division of meat, the defendants receiving one-half and he the other half. He avers that the agreement was carried out each year according to its terms up to and including the year 1938. He sets out further that in order to facilitate the defendants in attending to their duties under the contract in rounding up the hogs at the killing season, he loaned the defendant Pattin a black hog-dog named Black, a riding saddle, a blanket and a bridle.

He further avers that, at the time of the agreement, he was the owner of two hog marks or brands which he describes and which he now finds recorded in the office of the clerk of court of the parish in the name of the defendant Pattin.

In substance plaintiff alleges that in 1938 the defendants failed to carry out their part of the agreement and refused to turn over any of his hogs when called on by him to do so and that they also refused to return the property which he had loaned them. He estimates the number of his hogs under care of the defendants at eighty-five and in addition claims that they have unlawfully converted thirty-five more by branding them with the mark illegally recorded in the name of Pattin.

The prayer of his petition is that he be declared to be the owner of the eighty-five hogs in the care of the defendants, of the black hog-dog, the saddle, blanket and bridle which they have in their possession as well as of the hog marks or brands recorded in the name of Pattin. He further prays that defendants be condemned to return to him all the said hogs and property loaned to them by him. With regard to the brands he prays that they be ordered to have the clerk of court cancel the recordation of same now appearing in Pattin's name or in default of their doing so that they be cancelled by virtue of the judgment in his

favor and further that defendants be ordered to return the thirty-five hogs illegally branded with Pattin's alleged brand and that he be authorized to remove the said marks from the said hogs and replace them with his own brand.

Defendants for answer deny any such agreement as alleged by plaintiff in his petition. They admit having possession of the property involved in the controversy and then affirmatively set out their ownership of same by purchase from the plaintiff. They deny the allegations with regard to the hog marks claimed by plaintiff and admit that the defendant Pattin has had recorded his ownership of the same which he still claims as his property.

After trial there was judgment in the district court in favor of the defendants dismissing plaintiff's suit and he has appealed. The trial judge assigned written reasons for judgment in which he indicates in rather positive terms the difficulty he experienced in reaching the conclusion that there had been a sale of the hogs and other articles as contended by the defendants. The doubt which he seems to have entertained and which appears from reading the written reasons of the district judge caused us to examine into the facts with perhaps a bit more than usual and ordinary attention and our investigation has led us to a different conclusion than that reached by him.

The record contains a mass of confusing and conflicting testimony, a large bit of which, as noted by the district judge, was wholly irrelevant and could well have been excluded. We take it that it was in an effort to get all the light and information possible on the alleged transaction that it was admitted, but unfortunately it has served no purpose except to unnecessarily encumber the record.

It appears from the testimony that the plaintiff was the owner of a large number of hogs branded with his marks which roamed at large in the woods in the vicinity of Turkey Creek. It was his custom to arrange with some one to attend to them for him and under the agreement which he always made, a certain number of hogs were killed each year and the meat was equally divided between himself and the caretaker. In 1932 he estimates that he had about three hundred hogs in the woods and in December of that year, according to his contention, he entered into such an agreement as just described with the defendants whereas in this instance it is claimed by the latter that the defendant Pattin bought the hogs from plaintiff, the sale also including a horse, hog-dog, bridle, saddle and blanket.

The plaintiff testifies most positively that he entered into the agreement as alleged by him and that the defendant Pattin was to have the use of his horse, dog, saddle, bridle and blanket, all of which were turned over to him. The defendant Mack was to live on his place and farm the property on a share basis of fifty per cent of the amount of the crops produced and harvested. He testifies that the agreement was carried out and each year he received his one-half of the meat from the slaughter of the hogs. In 1937 he noticed an appreciable decrease in the number of hogs and received only 90 pounds of meat as his share of the killing. So, in February 1938, he notified Pattin that he would terminate the agreement and demanded the return of his horse, saddle and dog which Pattin refused to deliver, claiming them as well as the hogs as his own by having bought and paid for the same. At that time there remained only eighty-five hogs. He then learned that Pattin had caused to be recorded an affidavit claiming to be the owner of all the hogs bearing his hog mark and owner also of the brand itself.

According to plaintiff's testimony the agreement was entered into at night at the defendant Pattin's home and in the presence of certain members of Pattin's family, including the co-defendant Mack, Pattin's son-in-law, and a man named Marshall Deville.

Pattin's version of what happened is that in 1932, the plaintiff was indebted to him for money which he had borrowed from time to time and as he was crippled and getting old and could not pay him, and was fast losing his hogs, after several days effort in trying to settle with him, finally persuaded him to take the hogs, horse, dog and bridle in payment. The blanket, he says, was not included as the one he had, he had bought from Marshall Deville. In his testimony when he is asked how much did he pay for all that he had bought, he says that he made him an offer of $50 and 500 pounds of meat which was accepted. He states that he complied with his part of the agreement by delivering a certain quantity of meat each year. Right here there appears an inconsistency in his testimony which we find it impossible to recon-

cile with his version of what the transaction was. At first he states that plaintiff, after apparently much effort, persuaded him to take the property in satisfaction of an indebtedness which he owed him and then he says that the consideration for the sale was $50 and 500 pounds of meat. If it be assumed that the sum of $50 represented the amount of the indebtedness due him by plaintiff as might be inferred from the testimony of the codefendant Mack, the matter next appears further complicated by the testimony of his wife who was also a witness to the transaction and who recalls very definitely that the $50 was handed to plaintiff by herself, not on different occasions, but all at one time.

Pattin testifies that he delivered meat to the plaintiff each year as indeed it was proven by numerous witnesses that he did, but he contends that it was on account of the 500 pounds he owed him as part of the consideration of the sale. He however kept no record of the amount delivered each year and obtained no receipt from the plaintiff. When asked how much the 500 pounds of meat was worth, he answers that he does not know. "I feel he got a good bargain", he says, "I did not mind giving it to him." The testimony of the codefendant Mack concerning the delivery of the 500 pounds of meat is just as uncertain and indefinite as that of Pattin and when, in this connection we come to consider the testimony of Hosea Johnson, another son-in-law of the defendant Pattin, and his own witness, who says positively that what plaintiff got "up until this day" was his one-half interest in the hogs, we are bound to look with disfavor on the testimony of the defendants and conclude that on the whole, plaintiff's version of the transaction is the more strongly supported by the surrounding facts and circumstances.

As another of the circumstances which appears a bit significant, we might refer to the recording of Pattin's affidavit concerning the ownership of the brand with which the hogs were marked up to only a short time prior to the filing of this suit. It was only following their disagreement in 1937 after the delivery of the meat for that year that he caused the brand to be recorded in his name and yet from the affidavit itself it appears that though he had been using it as his own for the past five years, he is only then adopting it as his mark for the purpose of branding all his stock and hogs roaming at large. It

is to be observed that he makes no reference whatever to the marks having been included, as he now claims, in his purchase of the hogs and other property from the plaintiff.

The district judge says that he placed much reliance on the testimony of Marshall Deville who is said to have been a witness to the transaction, but the only thing he claims to know about it, according to his own testimony, is that on a certain night when the parties were at Pattin's house plaintiff called him outside and told him that he wanted him to be a witness to the fact that he had sold his hogs, horse, saddle and bridle to Pattin. As a matter of fact he does not pretend to have been present when the deal, whatever it was, was finally agreed upon. His testimony is so uncertain and contradictory that it is hard to understand exactly what he knows beyond what plaintiff told him. Although it appears doubtful whether any of it should have been admitted, it was not objected to and really, we cannot appreciate its value in reaching a conclusion one way or the other. We find it unnecessary to make any further comment as we are convinced that the facts as gleaned from the testimony and the attending circumstances corroborate the plaintiff's side of the case and disprove the contentions of the defendants. We find it necessary therefore to reverse the judgment appealed from.

It is, for the reasons herein stated, ordered, adjudged and decreed that the judgment appealed from be and the same is hereby reversed, annulled and set aside and it is now ordered that there be judgment in favor of the plaintiff, John W. Walker, and against the defendants, L. Alphonse Pattin and H. D. Mack, declaring said plaintiff to be the owner of the eighty-five hogs, or so many thereof as may now be found, claimed by him herein, of the black hog-dog, named Black, the riding saddle, blanket and bridle, and also of the hog marks recorded in the name of the defendant Pattin. It is further ordered that the said defendants return all of the said property to the plaintiff and that they order the cancellation of the said hog marks or brands now appearing in the name of the defendant Pattin from the records of the office of the clerk of court in the parish of Evangeline, and in default of their doing so that this judgment stand as an order to the clerk of court to that effect.

It is further ordered that the defendants be ordered to return to the plaintiff the thirty-five hogs, or so many of them as may be found which they illegally converted to their own use by branding them with their respective brands and that plaintiff be authorized to remove such brands and re-mark the said hogs with his own brand.

It is further ordered that the defendants pay all costs of this proceeding.